# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01653-COA

**VICTORIA WILBOURN**
APPELLANT/
CROSS-APPELLEE

**v.**

**RICHARD WILBOURN, III**
APPELLEE/
CROSS-APPELLANT

DATE OF JUDGMENT: 06/14/2018
TRIAL JUDGE: HON. LARRY BUFFINGTON
COURT FROM WHICH APPEALED: MADISON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT: MATTHEW THOMPSON
WILLIAM TERRELL STUBBS
ATTORNEYS FOR APPELLEE: CECIL MAISON HEIDELBERG
CYNTHIA H. SPEETJENS
JOHN ROBERT WHITE
NATURE OF THE CASE: CIVIL - DOMESTIC RELATIONS
DISPOSITION: ON DIRECT APPEAL: AFFIRMED. ON
CROSS-APPEAL: AFFIRMED - 02/27/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1. Victoria Wilbourn (the mother) appeals from the Madison County Chancery Court's final judgment of custody, child support, and visitation. Victoria argues that the chancellor erred when he awarded Richard Wilbourn III (the father) physical custody of their children during the summer. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Victoria is a native of Ukraine and has family there. While Richard was visiting Ukraine as a part of his Christian ministry, he met Victoria. They married in 1999 and had

two daughters: S.W. was born in 2001, and D.W. was born in 2003. Over the years, their marriage suffered because neither of them felt loved or respected by the other. After participating in marriage counseling at Live Oaks Counseling and continuing with the counseling for approximately three years, Victoria desired separation.

## I. Complaint for Separation

¶3. On October 24, 2006, Victoria filed a "Complaint for Separate Maintenance and For Protection from Domestic Abuse" against Richard, alleging that Richard had been physically and mentally abusive to their daughters. In the complaint, Victoria sought a protective order against Richard to restrain him from coming onto the premises of their marital home, which was located in Ridgeland, Mississippi. On October 25, 2006, after Chancellor William Lutz's urging, Richard agreed to the entry of a temporary protective order.

¶4. After Victoria's allegation of abuse, the Mississippi Department of Human Services became involved. Willie Garner, an investigator in the Madison Family and Children Services Division, noted in his investigation report that Garner arrived at the marital home on the day Victoria filed her complaint for separation.

### A. Investigator Willie Garner

¶5. Willie Garner submitted his investigation report on October 31, 2006. Investigator Garner did not find any evidence of emotional or physical abuse, finding no evidence to show "that they [had been] emotionally abused." Because Richard and Victoria admitted that Richard would spank the children with a fishing rod, Garner classified the case as one of "prevention" and recommended that the parents take parenting classes to educate themselves

on "alternative methods of disciplining."

¶6. On November 10, 2006, Chancellor Lutz appointed John Elliot as the guardian ad litem (GAL) in this case. On November 16, 2006, Chancellor Lutz entered an "Agreed Order Granting Temporary Relief," which ordered "[n]either party [to] spank the minor children" and for Richard to begin counseling. Chancellor Lutz further ordered both parents to attend a parenting class held by Dr. Angela Herzog.[1]

### B. The GAL John Elliot

¶7. Elliot did not provide his first GAL report until January 25, 2007, concluding that there were no signs of physical abuse. Elliot came to this conclusion partly because of statements Victoria and Richard made.

¶8. During Victoria's interview, she stated that although Richard only spanked the children for disciplinary reasons, she believed he spanked them too hard. Victoria believed that punishment should involve taking away things that the girls enjoy, such as candy. This difference in parenting resulted in Victoria's allegation of Richard abusing the children because the spankings sometimes caused bruising on the children's bodies.

¶9. In response, Richard told Elliot that Victoria's photographs, depicting S.W.'s bruise marks, were the direct result of her body "bruis[ing] easily," as corroborated by medical documents from her doctor, not from any extreme cruel and unusual punishment.

¶10. When Elliot observed the children at the marital home, he watched them interact with Richard. After observing the children, Elliot concluded that they "appeared to love their

---

[1] Later that year, Chancellor William Lutz retired. The case was reassigned to Chancellor Cynthia Brewer.

father and enjoy his company." He also concluded that the children did not appear afraid of Richard. Elliot then provided further details about Richard's and Victoria's parenting style. In Elliot's opinion, Richard appeared to be a stricter parent who believed in disciplining the girls by spanking them with a switch, whereas Victoria did not. Elliot ultimately found that the disciplinary issues between the parties were due to their "cultural and familial differences." In his opinion, Richard did not abuse the children.

¶11. In his second report, Elliot mentioned a conversation he had with Richard about him bathing the children. Richard provided Elliot with a list of the dates and the number of times that he bathed them. Elliot believed that Richard was very active with the children and that the parents did not trust each other because of the ongoing litigation. Elliot recommended that the parents continue with marital counseling. He found that the children were safe and that the issue of 'abuse' was moot.

## II.    Complaint for Divorce

¶12. On April 3, 2007, Victoria filed a "Complaint for Divorce and Other Relief" on the ground of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Victoria did not reference any specific incidents to show or describe Richard's allegedly cruel and inhuman treatment but, instead, asserted that Richard's actions continued to affect her physical, mental, and emotional well-being. In addition to a divorce, Victoria requested that she receive sole physical and legal custody of the children. Separately, Victoria moved to consolidate her October 2006 and April 2007 complaints.

¶13. On April 26, 2007, Victoria filed a petition for an independent medical evaluation.

4

In this petition, Victoria alleged for the first time that Richard bathed with the children before or while they were ages five and three. Richard answered Victoria's complaint for divorce and attached a counterclaim for sole physical and legal custody of the children.[2] Richard denied that he had engaged in habitual cruel and inhuman treatment. He further denied all abuse allegations.

¶14. On April 27, 2007, Richard moved for temporary relief. He requested that he be given sole legal and physical custody of the children and shared use of the marital home during the pending litigation. On May 17, 2007, Chancellor Brewer entered her "Second Order Granting Temporary Relief." In the order, the chancellor explained that she limited the evidence presented to events that occurred after the November 2006 "Agreed Order Granting Temporary Relief." She then awarded the parents joint legal and physical custody of the children, while keeping the other terms of the November 2006 agreed order in place. On June 11, 2007, by agreement of the parties, the chancellor ordered Richard and Victoria to undergo independent medical evaluations by Dr. Criss Lott.

¶15. On August 3, 2007, Dr. Lott submitted his psychological evaluation report. He opined that while Victoria had concerns about Richard's "bathing with the girls," she did not report the allegations to anyone until she met Dr. Mary Brown, the clinical psychologist. Dr. Lott's report further explained that because Victoria's father had told Richard to stop bathing with the children in 2007, Richard stopped bathing with them around that same time.

¶16. Dr. Lott also wrote about the notes he received from Dr. Herzog, the doctor who

---

[2] The divorce and child custody issues were later bifurcated.

5

supervised the parenting class. In these notes, Dr. Herzog asserted that the children were scared of being spanked by Richard because he spanked them with a fishing rod that would leave bruises. S.W. did not know that the spankings were "bad" until her mother told her. In the report, Dr. Lott explains that Richard's mother had once witnessed Richard spank the children and found it to be "horrendous." There was also a further indication from S.W. that Richard did not wear clothes when he was bathing the five- and three-year-old girls.

¶17. Dr. Lott received records from Dr. Brown as well. According to Dr. Brown's notes, Victoria was very concerned with Richard's anger issues and his spanking the children. Dr. Brown noted that Victoria had told her Richard "stopped bathing with the children after her father told him it was not appropriate."

¶18. After testing the parents, Dr. Lott found that Victoria did not have any problems with functioning or regulating her mood. Dr. Lott further found that Richard appeared to have the character profile of a person with "chronic, intense anger." Dr. Lott stated that "brief episodes of aggressive acting out may occur" and that people with this profile "tend to blame other people for their problems." Dr. Lott also observed that the children interacted well with both parents and found "no signs of anxiety or apprehension with either parent."

¶19. Dr. Lott surmised that neither parent has a mental health disorder. Dr. Lott opined that Richard's "parenting style [was] more authoritarian." In regard to the "bathing issue," Dr. Lott concluded that S.W. did not "describe any inappropriate behavior by the father." Richard had informed Dr. Lott that he (Richard) had not bathed with the children "in the past three years." Dr. Lott also noted that Victoria had told him "she did not believe that

6

[Richard] had sexually abused the children."

¶20.    In Dr. Lott's opinion, "there [was] no indication of sexual abuse."

### III.    Custody Trial

¶21.    On July 10, 2007, the trial was scheduled to be held on July 6, 2007. On July 5, 2007, by agreed order, the trial was continued to August 7, 2007. After additional discovery, the trial was continued to September 25, 2007.

¶22.    On September 7, 2007, Richard moved to modify the second order granting temporary relief requesting specifications on the visitation schedule and for the court to "authorize the Guardian Ad Litem, John Elliot . . . to resolve conflicts concerning the minor children until those matters may be brought before the Court." On September 17, 2007, the chancellor scheduled the matter for hearing.

¶23.    On October 18, 2007, after a hearing on the motion to modify the second temporary order, Chancellor Janace Harvey Goree[3] rendered a bench ruling. On December 21, 2007, Chancellor Goree entered the "Third Order Granting Temporary Relief," ordering Victoria to vacate the marital home. However, the chancellor stated that the terms of the original November 16, 2006 agreed order granting temporary relief and the second order granting temporary relief entered on May 17, 2007, would remain in effect.

¶24.    Chancellor Goree originally scheduled the custody trial to begin on July 8, 2009, anticipating a nine-day trial that would be broken up into two sets of three days in court (February 18-20, 2009; October 13-16, 2009; and April 13-16, 2010). After Victoria

---

[3] Chancellor Brewer recused herself on October 17, 2007.

7

presented her case-in-chief, the last two days of trial (April 13-15, 2010), were moved up to December 16 and 17, 2009, "so that the parties [could] have a final resolution to [the] matter at an earlier time." Chancellor Goree orally recused herself on the day trial was set to resume due to an undisclosed concern over the appearance of impropriety. Richard filed a motion for the chancellor to reconsider her recusal. Victoria responded in opposition. On April 27, 2010, Chancellor Goree entered a written order of recusal.

¶25. Over the span of about three years, the Supreme Court appointed three special chancellors. The Honorable Thomas L. Zebert (appointed on August 19, 2010) and the Honorable Edward Prisock (appointed on September 1, 2010) both recused due to undisclosed conflicts of interest. Chancellor Larry Buffington ultimately presided over the remainder of the proceedings, and the multi-day trial eventually re-commenced with a hearing on August 11, 2014. The trial did not end, however, until April 19, 2017.[4] That being said, we address only the most relevant testimony in this opinion.

¶26. During the August 11-12, 2014 hearing, Dr. Lott testified that the children had conveyed to him that "they were happy with the visitation scheduled and there wasn't anything at all going on with them or had been going on with them in the last year or two since [he'd] seen them." Dr. Lott further testified that any issues that were present in 2007, had been resolved.

¶27. Ultimately, at the hearing on August 12, 2014, the chancellor found that

---

[4] The record reveals no justification for the lengthy delay in deciding these custody matters. It appears that the record remained dormant for almost two years (between 2010 and 2012) and that motions to modify temporary orders and petitions for contempt were filed, resulting in a continual extension of the trial.

both parents are fit parents right now. That there's no abuse that has occurred. That he did not abuse these children in any manner, as far as for the purposes of these children. Because I'm satisfied from having read the transcript, looked at the other items, and what I heard today that he has nothing but the best interests of those children at heart. And that one occasion – and I am going - - One occasion - - that it doesn't rise to the effect of being abused on this child. It may have been a mistake if he did it. And I'm not making the finding that he did or didn't because to me it doesn't matter. That was way back in time. I've had nothing to show otherwise. And, therefore, on the record now, so that you don't have to worry about that back there, that your client did not abuse those children and that he is a fit and proper person to have custody and control of his minor children.

The chancellor further stated that "we just need to go from the date of separation forward."

The chancellor also explained that the previous chancellor was also satisfied that the children had not been abused. Thus, there was no need to continue to discuss those issues, like the bathing of the children. The chancellor further found that

it seems like the bathing incident and all that . . . there was a question about whether he ought to have been bathing with the children and doing those type things. And that's why I'm clearing that out. I don't think any of that was improper. But I think that - - you know it may not be what everybody does. But just because everybody doesn't do it doesn't mean it's wrong.

¶28. On January 27, 2015, S.W. testified about her relationship with her father. She testified that she had looked at things on her father's phone and computer that she was not supposed to see. She also discussed the sleeping pills he gave her because she could not sleep when at his house. Then she testified about Richard's anger issues. She said that she liked to hide in the closet when Richard got angry. S.W. also accounted for the extreme disciplinary practices that Richard employed. She said that "[h]e would lock me up in my room for a very long time sometimes for no reason. I mean, at least, I didn't know the reason." "He would punish me by withdrawing meals sometimes." She said, "I wish he

9

could have been a better father." She did not have any issues with her mother and desired to live with her mother.

¶29. Subsequent hearings were held to determine the extent to which each parent would have custody over the children. In addition, Chancellor Buffington scheduled additional trial dates for August 2016 and December 2016.

¶30. On August 22, 2016, the youngest daughter, D.W., testified. She also wanted to live with her mom. She said, "I want to live with my mom, but maybe I want to see my dad every other weekend." She testified that she loved her dad. She said that he had anger problems and that she was scared when he texts and drives. Because of her dad's anger problems, she would get anxious and nervous around the house and could not sleep.

¶31. On June 13, 2016, the chancellor appointed Staci O'Neal, as a GAL after the parties suggested Elliot, the former GAL, may have "blurred his duties."[5] After her investigation, O'Neal submitted a final report to the court on August 13, 2016.

¶32. On April 19, 2017, the chancellor held a final hearing on the custody matter. O'Neal testified to the contents of her report and gave a final recommendation of joint custody. O'Neal acknowledged S.W.'s statements that S.W. was "exposed" to what she called "pornography," but O'Neal did not definitively find that the alleged contents on Richard's television or phone were pornographic. She did conclude, however, that the media content

---

[5] Previous motions filed indicate that the court was concerned about the expansiveness of Elliot's services without his role being clearly defined. Elliot may have been appointed as counsel to represent the minors or as an arm of the court for investigative purposes. *See S.G. v. D.C.*, 13 So. 3d 269, 281 (¶47) (Miss. 2009). Thus, for good cause shown, the chancellor granted leave for the appointment of another GAL.

was "R rated." In any event, O'Neal determined that Richard was not "addicted to pornography" and that any exposure to the alleged pornography was "accidental." Further testimony from O'Neal revealed that, according to the children, Richard did not bathe them after they were ages eleven and eight.

¶33. O'Neal opined that "both parents at times have shown a lack of insight" and have been "completely inappropriate." She testified that although Richard had acted inappropriately by using a fishing rod to spank the children when the children were less than fifteen months old, at the time of her investigation there were no longer any issues with spanking or his parenting skills. O'Neal also considered the fact that Richard had been locking the children in their bedroom. She stated that it was unusual, but she spoke to the counselor and concluded that although she would not parent in this manner, she had come across children who would not remain in the bedroom for their time-outs. Ultimately, O'Neal testified that after considering Richard's past behaviors, "the best interest of [the] girls need[ed] to be look at as they [were] two teenagers" and not "preschool or elementary school kids." O'Neal ultimately determined that both parents were "capable of co-parenting and that [her] hope [was] that when [the] litigation [was] over that that [would] actually happen . . . ."

¶34. After reviewing the testimony and record from 2007 onward and considering O'Neal's final report, Richard's desire for the temporary order to remain in place, and Victoria's motions, the chancellor granted joint physical and legal custody to both parents. The chancellor gave a bench ruling that was later memorialized by entry on June 14, 2018, as the

11

"Final Judgment of Child Custody, Support and Visitation."[6] The chancellor ordered that the "mother shall have physical custody of the minor children during the school year, and the father shall have physical custody during the summer months."

## IV. Appeal

¶35. Victoria appeals from the chancellor's final judgment on child custody asserting three assignments of error: (1) that the court erred by not granting her motion to transform the temporary order into a permanent order; (2) that Chancellor Buffington erred by limiting the evidence at the custody trial to the last three years; and (3) that the chancellor erred by incorrectly weighing the *Albright* factors.[7] Richard cross-appeals, also challenging the chancellor's *Albright* analysis.

## STANDARD OF REVIEW

¶36. For these issues, "the standard of review employed by this Court for review of [the] chancellor's decision[s] is abuse of discretion." *Kerr v. Kerr*, 323 So. 3d 462, 469 (¶17) (Miss. 2021) (quoting *Alexis v. Black*, 283 So. 3d 1105, 1107 (¶10) (Miss. 2019) (quoting *McNeil v. Hester*, 753 So. 2d 1057, 1063 (¶21) (Miss. 2000))). "This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Id*. (quoting *Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 880 (¶13) (Miss. 1999)). "The standard of review in child custody cases is limited. Reversal occurs only if a

---

[6] The court subsequently denied a motion to alter or amend the judgment on April 22, 2019, but also struck a medication reference from the June 14, 2018 final judgment.

[7] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

chancellor is manifestly wrong or applied an erroneous legal standard." *Kerr*, 323 So. 3d at 469 (¶17) (quoting *Barber v. Barber*, 288 So. 3d 325, 330 (¶22) (Miss. 2020) (quoting *Floyd v. Floyd*, 949 So. 2d 26, 28 (¶5) (Miss. 2007) (citing *Powell v. Ayars*, 792 So. 2d 240, 243 (¶6) (Miss. 2001)))).

## DISCUSSION

### I. Whether the chancery court erred by denying Victoria's motion to declare the temporary order a permanent order.

¶37. On November 16, 2006, Chancellor Lutz entered the *agreed order granting temporary relief* (the first temporary custody order). On May 17, 2007, Chancellor Brewer entered the *second order granting temporary relief*. On December 21, 2007, Chancellor Goree entered the *third order granting temporary relief*. On February 19, 2008, Victoria moved to modify the third order, asserting that there had been a material change in circumstances. On February 22, 2008, the chancellor entered an "Order Modifying Third Order Granting Temporary Relief," which denied Victoria's motion. On January 15, 2009, Richard and Victoria agreed to propose a modified temporary order once more after Richard filed a motion to modify in December 2008. On April 19, 2012, another motion was filed requesting modification of the third temporary order.

¶38. On August 4, 2014, Victoria filed a "Motion to Declare Temporary Order Final Order As To Custody." However, Victoria did not provide any legal citations in support of the argument. Later, the chancellor denied the motion. On June 14, 2018, the chancellor entered the final judgment on child custody.

¶39. Victoria argues that the court erred by denying her motion to make the third temporary

13

order the final, permanent order. In general, "[a] temporary custody order is not an appealable final order." Deborah H. Bell, *Mississippi Family Law* § 12.01[7][a] (3rd ed. 2019); *see also Hammon v. Hammon*, 289 So. 3d 1214, 1219 (¶¶19-21) (Miss. Ct. App. 2020). Usually, a temporary order is not "permanent." *McDonald v. McDonald*, 876 So. 2d 296, 297-98 (¶10) (Miss. 2004). However, in child-custody-modification cases, we have said that a temporary order can be considered "permanent" if the party can sufficiently demonstrate that the temporary order went "unchallenged" and had been in place for a long period of time. *Altom v. Jones*, 209 So. 3d 434, 440 (¶¶18-19) (Miss. Ct. App. 2016) (quoting *Swartzfager v. Derrick*, 942 So. 2d 255, 258 (¶10) (Miss. Ct. App. 2006)); *see also Quadrini v. Quadrini*, 964 So. 2d 576, 580 (¶17) (Miss. Ct. App. 2007); *Thompson v. Thompson*, 799 So. 2d 919, 926-27 (¶¶30-31) (Miss. Ct. App. 2001).

¶40. But that is not the case here. The third temporary order was contested in 2008, 2009, and 2012. Therefore, Victoria has neither shown that the chancery court erred nor that the third temporary order had been converted into an order that was final and appealable. *McDonald*, 876 So. 2d at 297-98 (¶10); Bell, *Mississippi Family Law* § 12.01[7][a]. As a result, the third temporary order lost its effect once the final custody decree was entered in 2018. *Summers v. Gros*, 319 So. 3d 479, 484 (¶14) (Miss. 2021). This issue is moot. *Id*.

**II.    Whether the chancellor erred by limiting the testimony to the previous three years.**

¶41. The chancellor did not abuse his discretion by limiting the testimony at the custody trial to the preceding three years. This litigation had been ongoing since 2006. The plaintiff, Victoria, rested her case-in-chief in 2009. As a part of her case-in-chief, Victoria submitted

14

the psychological report of Dr. Criss Lott and the investigative report of Dr. Yazdani. Since 2009, the children were having week-on/week-off visitation with both parents. In addition, hearings had been held after motions for contempt had been filed, along with one emergency petition. In other words, the chancellor in 2014 had access to all documents, testimony, and evidence that had been submitted in the case since 2006. Thus, it was permissible for the chancellor to limit the hearings to information that was not known to the court and had not been heard. Mississippi Rule of Evidence 403 permits a chancellor to exclude evidence that is cumulative or the presentation of evidence that will cause undue delay. *See Knotts ex rel. Knotts v. Hassell*, 659 So. 2d 886, 892 (Miss. 1995). In light of the circumstances, and the chancellor's admission to considering all the testimony and evidence in the case to make his custody determination, we find no error.

### III.    Whether the chancellor's *Albright* analysis was flawed.

¶42.    We reiterate that the chancellor's custody determination is subject to review on appeal as to the younger child alone. S.W. was born in 2001. Therefore, any issue with the chancellor's custody determination as to S.W. is moot. *Wise v. Broome*, No. 2020-CA-01316-COA, 2022 WL 213322, at *5 (¶17) (Miss. Ct. App. Jan. 25, 2022); *see Archie v. Archie*, 126 So. 3d 937, 942 (¶14) (Miss. Ct. App. 2013) ("A parent has no statutory or common-law duty to support a child who has reached the age of majority.").

¶43.    To the contrary, the chancellor's custody determination of D.W. remains viable.[8] The

---

[8] The dissent contends that the case is moot because D.W. is twenty years old, making the case *practically* moot. *Post* at (¶69). While society may view D.W. one way, the law does not; therefore, the custody issue at hand is not moot. As mentioned in *Wise*, our Court has made it clear that "child custody matters end when the child reaches the age of majority,

15

dissent disagrees because D.W. is a twenty-year-old woman who is allegedly in college, and who, as a practical matter, decides with whom she resides. *Post* at (¶69). However, "issues regarding the care and custody of a child become [] moot when a child is emancipated." *Wise*, 2022 WL 213322, at *4 (¶16) (citing *Cossey v. Cossey*, 22 So. 3d 353, 357 (¶17) (Miss. Ct. App. 2009)). Based on this rule, it necessarily follows that Richard's custody of D.W. is not moot, as D.W. has not reached the age of majority and has not been found emancipated. *Burrell v. Burrell*, 289 So. 3d 749, 754 (¶20) (Miss. Ct. App. 2020); *Hays v. Alexander*, 114 So. 3d 704, 708-09 (¶14) (Miss. 2013) (quoting Miss. Code Ann. § 1-3-27 (Rev. 2005)). Accordingly, we proceed with an analysis of whether the chancellor misapplied the *Albright* analysis when making his custody determination to the extent that it affects D.W.

¶44. The chancellor awarded Victoria physical custody of the children during the school year, with Richard having physical custody during the summer. On appeal, both parents take issue with the chancellor's *Albright* analysis and custody determination, but for different reasons. Victoria argues that based on the evidence presented, the chancellor erred by awarding Richard physical custody during the summer because the sex-of-the-child factor and the preference-of-the-child factor favored her, while none of the factors favored Richard. Richard agrees with the chancellor's decision to grant him physical custody during the summer but challenges the chancellor's *Albright* analysis, as well, for his own reasons discussed below.

---

which in Mississippi is twenty-one years old." *Wise*, 2022 WL 213322, at *4 (¶17). After that time, the issue of custody *may* become moot. *See id.*

¶45. "The foremost consideration in any custody decision is 'the best interests and welfare of the minor child.'" *Smith v. Smith*, 206 So. 3d 502, 512 (¶24) (Miss. 2016) (quoting *Albright*, 437 So. 2d at 1004-05).

> To help guide us to a proper determination as to custody, the court considers the following factors in determining the child's best interests: (1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship.

*Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001) (citing *Albright*, 437 So. 2d at 1003-05). The *Albright* factors are "not intended to be exhaustive but a beginning point." *Smith v. Todd*, 464 So. 2d 1155, 1158 (Miss. 1985). "While the *Albright* factors are extremely helpful in navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula." *Lee*, 798 So. 2d at 1288 (¶15). "Determining custody of a child is not an exact science." *Id*. "Where the chancellor properly considers and applies the *Albright* factors, the appellate court cannot say the chancellor is manifestly wrong; such careful consideration and application by the chancellor precludes reversal on appeal." *Ballard v. Ballard*, 289 So. 3d 725, 732 (¶25) (Miss. 2019); *accord Jerome v. Stroud*, 689 So. 2d 755, 757 (Miss. 1997) (citing *Smith v. Smith*, 614 So. 2d 394, 397 (Miss. 1993)).

A.      *Health and Sex of the Children*

17

¶46.    Richard argues on cross-appeal that the chancellor's custody determination should be affirmed. Alternatively, Richard argues that the chancellor incorrectly analyzed the second *Albright* factor, health and sex of the child.  He argues that the fact that the children were female should not have weighed in Victoria's favor but should have been neutral.  On the other hand, Victoria argues that the chancellor erred by finding that the "health of the children" favored neither parent because substantial evidence showed that she was the primary caregiver for D.W. and had been taking care of D.W. since she developed scoliosis.

¶47.    The chancellor found the sex of the children favored Victoria.  But the chancellor found that the health of the children favored neither parent because D.W. was participating in cross-country and had "no major health problems."  The age, health, and sex of the children is but one factor of many.  *See Smith*, 206 So. 3d at 512 (¶24) (explaining that the *Albright* analysis is not "premised solely on a scoring system 'where findings on each factor are added' and later compared to see which parent 'wins'" (quoting *O'Briant v. O'Briant*, 99 So. 3d 802, 805-06 (¶16) (Miss. Ct. App. 2012))).  While the chancellor did err by solely relying on the fact that D.W. was female as the reason to favor the mother when D.W. was not of tender age, this error was harmless and does not taint the entire analysis.  *Mayfield v. Mayfield*, 956 So. 2d 337, 342 (¶11) (Miss. Ct. App. 2007); *Crabb v. Bowden*, 110 So. 3d 346, 351 (¶20) (Miss. Ct. App. 2013).

B.    *Best Parenting Skills*

¶48.    Victoria argues that the chancellor erred by finding that the third factor did not favor either parent. According to Victoria, and as to D.W., the chancellor failed to consider that

18

Richard's parenting skills were inappropriate because he (1) had angry outbursts, (2) bathed the children when they were young (using his hands for D.W. when she was under age six), and (3) spanked them with a fishing rod. Although Victoria acknowledges that the GAL found that the spanking did not rise to the level of abuse, Victoria contends that considering the evidence in totality, the chancellor erred by not finding this factor in her favor.

¶49. Again, the chancellor is the ultimate fact-finder, and we cautiously review the record to determine whether the chancellor's finding of fact is supported. *Garner v. Garner*, 343 So. 3d 1097, 1107 (¶57) (Miss. Ct. App. 2022).

¶50. In this instance, the record supports that Richard had angry outbursts. Both children testified about them. But in terms of Victoria's allegations of inappropriate sexual conduct that were rooted in Richard's bathing the children with his hands, the evidence was conflicting. D.W. testified that her father bathed her with his bare hands; however, Richard testified that he did not bathe D.W. after she reached a certain age. In addition, Elliot reported that the sexual accusations were unsubstantiated. This evidence was corroborated by Dr. Lott's investigatory report. In both reports, it is written that Victoria did not believe that Richard had committed any sexual abuse toward D.W., and D.W. likewise testified that she had never been inappropriately touched by her father. Moreover, the spanking that Richard inflicted on D.W. occurred before the 2007 temporary order was entered prohibiting either parent from spanking the children. Considering this evidence in totality, the chancellor acted within his discretion to find that the third factor was neutral. The chancellor found that the parties came from different backgrounds and had different ideas about parenting. Elliot's

report supported this notion. *See Garner*, 343 So. 3d at 1107 (¶57) ("[I]n any case where a guardian ad litem is appointed to represent a child, the chancellor's role as fact-finder requires the evidence presented by the guardian ad litem, as well as all other relevant evidence, to be considered and given such weight as *the chancellor determines it deserves*."). We find no abuse of discretion. *Strait v. Lorenz*, 155 So. 3d 197, 209 (¶51) (Miss. Ct. App. 2015) ("We find no error in the chancellor's reliance on the GAL's report.").

### C. *Continuity of Care Prior to Separation*

¶51. The chancellor found this factor was irrelevant because the temporary order had been in place for over ten years. "[C]ontinuity of care after separation can be considered by the chancellor," therefore, we find no abuse of discretion. *Kerr*, 323 So. 3d at 478 (¶58) (quoting *Blakely v. Blakely*, 88 So. 3d 798, 805 (¶31) (Miss. Ct. App. 2012)).

### D. *Willingness and Capacity to Care for the Child*

¶52. The chancellor found that both parties had the willingness and capacity to take care of the children, which they evidenced by taking care of them during the course of the litigation. The chancellor found this factor favored neither party over the other. Victoria contends that the chancellor erred by finding that Richard had the willingness and capacity to take care of D.W. because he utilized babysitters and a daycare center as resources when he was unable to watch her. Similarly, however, Victoria also used babysitters (her mother and father) to watch over the children and to help support their needs when necessary. No evidence supports that neither parent had the capacity to take care of D.W. The chancellor did not err.

E. *Employment Responsibilities of Both Parents*

¶53. The chancellor found that the employment status of the parties was neutral. The chancellor considered the fact that Richard was self-employed and that Victoria was employed with the flexibility of taking off work when necessary. Substantial evidence in the record supports the chancellor's finding.

F. *Physical and Mental Health and Age of the Parents*

¶54. The chancellor found the sixth factor to favor neither party. Ultimately, the chancellor concluded that neither one of the parent's conditions was of such detriment to preclude them from raising the girls.

G. *Emotional Ties of the Parents and Children*

¶55. The chancellor found that the emotional ties of the parents and children favored neither party, relying on the GAL's report stating that the children have a strong tie to both parents. Likewise, the record supports that D.W. had a strong relationship with her father. She testified that she loved her father and wanted to have visitations with him every other weekend. Thus, the chancellor did not err by finding that this factor favored neither party.

H. *Moral Fitness of the Parents*

¶56. The chancellor found that this factor did not favor either party. Victoria argues that this factor should have favored her. Even though Victoria admits to the affair, she discounts it by asserting that the children were not aware of it. Victoria also asserts that because testimony revealed that Richard watched videos of persons committing lewd acts, the chancellor erred in his assessment of this factor. It was concerning that S.W. saw Richard

watching these videos and that it may have had an impact on her development. D.W., however, did not testify to ever seeing her father commit such behavior. It was within the chancellor's discretion to find the morality of both parents a neutral factor due to the affair and lewd video watching.

### I. *Home, School, and Community Record of the Children*

¶57. Victoria argues that the chancellor erred by not finding this factor in her favor because the children had been going to school in her school district since 2014. Based on our review, however, the chancellor also considered S.W.'s attendance at a school closer to Victoria, but this did not change the chancellor's conclusion. Both children had been in private school, and both parents lived in the area. This finding was not in error because substantial evidence supported that the children's parents were involved in their education and activities. *See Wooten v. Wooten*, 333 So. 3d 610, 618 (¶25) (Miss. Ct. App. 2022) (upholding chancellor's finding that this factor favored neither party).

### J. *Preference of the Child*

¶58. The chancellor found this factor weighed in Victoria's favor. Both children expressed a preference for living with their mother by submitting affidavits to this effect and testifying to the same. Apart from S.W. however, D.W. gave testimony stating that she preferred to have an alternating weekly visitation with her father. She did not want him to have visitation during the week because it made attending school for the children more difficult. She was agreeable to summer visitation.

¶59. Victoria argues that the chancellor erred because he did not give specific reasons for

22

"why he did not follow the children's lawful custodial elections." But, Victoria is incorrect. The chancellor honored D.W.'s preference by awarding the parents joint legal custody of D.W. Thus, Victoria's argument is without merit on this factor.

K. *Stability of the Home and Employment of Each Parent*

¶60. The chancellor found that this factor favored neither party because each parent had a home for the children to reside in and each parent had suitable employment. Victoria argues that the chancellor's conclusion was not supported by the evidence because testimony showed that she had the children on a routine schedule; whereas, Richard had many out-of-town work requirements and a multitude of babysitters watching the children.

¶61. But, the chancellor's finding was supported by substantial evidence and we find no reason to hold the chancellor in error. The record supports that over the duration of the litigation both parties had homes for the children. The father was able to remain in the marital home. *Stewart v. Stewart*, 309 So. 3d 44, 95 (¶176) (Miss. Ct. App. 2020). Further, the chancellor mentioned the fact that Victoria lived with her grandparents, while Richard lived alone. *Sanders v. Sanders*, 281 So. 3d 1043, 1051-52 (¶30) (Miss. Ct. App. 2019).

L. *Other Relevant Factors*

¶62. The chancellor considered the fact that Victoria was alienating the children from Richard by not informing him of the children's medical appointments. The chancellor was also concerned about Victoria's decision to further antagonize Richard during drop-offs/pick-ups by bringing along her father who has dissension with Richard. On the other hand, the chancellor also considered Richard's anger issues.

¶63. Victoria argues that the chancellor erred by stating that Richard's anger issues were never directed at the children. She argues that the evidence was clear that the children were anxious and scared around Richard because of his outbursts of anger.

¶64. While there is testimony that supports that the children were affected by Richard's anger problems, we are satisfied that the chancellor considered this testimony before reaching his decision. We find no abuse of discretion in the chancellor's statements or findings here.

¶65. The question before this Court is whether the chancellor erred by finding that it was in the best interest of D.W. for Victoria and Richard to have joint legal and physical custody. After careful consideration of the testimony, Victoria's physical abuse and sexual allegations against Richard, Elliot's GAL report on those allegations, Dr. Lott's psychological exam of the children, and the chancellor's findings of fact, we hold that the chancellor did not abuse his discretion. The evidence of physical abuse was found unsubstantiated, and the evidence of inappropriate sexual behavior around the children was conflicting. The chancellor was present for the testimonies given by the parents and the children, and we are reluctant to overrule the chancellor's custody determination.

**CONCLUSION**

¶66. We acknowledge that the behaviors and knowledge of the two girls at such a young age are concerning and that they may or may not have been caused by Richard's suspicious behavior. However, substantial credible evidence depicted that Richard acted in a manner that did not give rise to emotional, physical, or sexual abuse. Because the chancellor's rulings were within his discretion after weighing the evidence, which was voluminous since

24

the custody battle began in 2006, we affirm the chancery court's final judgment, as amended.

¶67.    **ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED.**

**CARLTON, P.J., McDONALD, SMITH AND EMFINGER, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., GREENLEE AND LAWRENCE, JJ.; McCARTY, J., JOINS IN PART.**

**WILSON, P.J., DISSENTING:**

¶68.    This appeal and cross-appeal solely concern the physical custody of two sisters who are now twenty-two and twenty years old, respectively.[9]  This case was filed in 2006, tried in 2009, and, following a series of judicial recusals, re-tried from 2014 to 2017.  The trial court delivered a bench opinion in 2017, entered a final judgment in 2018, and finally ruled on Richard's motion to alter or amend the judgment in 2019.  The record on appeal was not filed until March 2022.[10]  The Supreme Court assigned the case to this Court in May 2023, and briefing was finally completed in June 2023.[11]

---

[9] Victoria's appeal only challenges the trial court's award of joint physical custody, arguing that she should have been granted sole physical custody.  Richard argues that the trial court's ruling should be affirmed.  His cross-appeal only challenges the trial court's application of two *Albright* factors, which he asks this Court to address only if a remand is required.  Neither party challenges the award of joint legal custody.

[10] Richard filed objections to Victoria's designation of the record, which the trial court resolved in October 2019.  Justices of the Supreme Court thereafter granted a series of extensions to the trial court clerk and the court reporters to prepare the voluminous record.  Neither party filed any motion objecting to the delays or seeking to expedite the appeal.

[11] Justices of the Supreme Court granted several requests by the parties for extensions of time to file briefs.  Again, neither party filed any motion objecting to the delays or seeking to expedite the appeal.

¶69. Under the circumstances, this case has become moot. The majority acknowledges that the case is moot with respect to S.W., who has reached the age of majority. I would find that it is also moot with respect to D.W., who is now a twenty-year-old college student.[12] I recognize that Richard's obligation to pay child support will continue until D.W. reaches the age of twenty-one later this year, *see* Miss. Code Ann. § 93-11-65(8) (Rev. 2021), but neither party challenges the trial court's award of child support, and it will not be affected by this appeal or cross-appeal.[13] Thus, all that is at issue in this appeal and cross-appeal is the "physical custody" of a twenty-year-old woman who will turn twenty-one later this year—more specifically, we are deciding who should have "custody" of her this summer. As a practical matter, D.W. can live where she wants to live. The physical custody provisions of the final judgment no longer have any real practical effect. *See, e.g.*, *Gamma Healthcare Inc. v. Est. of Grantham*, 334 So. 3d 85, 87 (¶2) (Miss. 2022) ("A case is moot if a judgment on the merits would be of no practical benefit to the plaintiff or detriment to the defendant." (quotation marks and ellipsis omitted)). For that reason, I would dismiss the appeal and cross-appeal and respectfully dissent.[14]

---

[12] According to Richard's brief, D.W. is attending college out of state. Richard concedes that the appeal and cross-appeal are also moot with respect to D.W.

[13] The final judgment requires Richard to pay the same amount of child support each month, including the months he exercises custody.

[14] I also note that the testimony and evidence in this case was offered between 2009 and 2017, when D.W. was between the ages of eight and sixteen, and the chancellor made his decision in 2017, when D.W. was sixteen. I see no compelling reason for this Court to review such stale evidence and a seven-year-old ruling to determine who should have "physical custody" of a twenty-year-old woman this summer.

**BARNES, C.J., GREENLEE AND LAWRENCE, JJ., JOIN THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**